BERT E. MALLORY, Appellant-Respondent, *v.* MARY McDERMOTT, as Committee of the Person and Property of FRANK J. McDERMOTT, an Incompetent Person, Respondent-Appellant.

Fourth Department, July 8, 1948.

*Robert M. Diggs* for appellant-respondent.

*George W. Bliss* for respondent-appellant.

LARKIN, J. Plaintiff is the owner of the oil and gas right of, and engaged in producing oil from, approximately sixteen acres of land in Allegany County, New York, close to the village of Bolivar. Defendant's incompetent, hereinafter referred to as defendant, is the owner of the surface of these sixteen acres, and also of the surface and oil and gas right of approximately twelve acres hereinafter mentioned as the restricted area, immediately adjoining on the south the above sixteen acres.

The complaint seeks an injunction to restrain defendant from producing oil from a well which he drilled in 1946, and from which he is now producing oil, in the restricted area, and asks an accounting for the oil produced from that well. The basis of the complaint is a claimed violation of a restriction contained in prior deeds forbidding defendant to drill any oil wells on the restricted area. The answer puts in issue the restriction, and it also pleads a counterclaim based on allegations that plaintiff, without right, has drilled an oil well in the restricted area, from which he has been and is producing oil. Defendant demands an accounting of the oil produced therefrom. After a trial at Special Term the court made a judgment dismissing the complaint, finding that there was no restriction operative against defendant. The same judgment also dismissed the counterclaim on a finding, in effect, that the well which plaintiff had drilled was on the north sixteen acres, and not on the restricted area. Each party appeals from the adverse part of the judgment.

To determine the issues raised by the complaint requires the construction of two deeds made by one Hunt to defendant, the first dated July 26, 1898, and the second, January 16, 1900, and another deed made by defendant April 23, 1907, to Price, Corbin and Root. The issues raised by the counterclaim present a purely factual question, whether the well therein mentioned is located on the restricted area.

Prior to the 1898 deed, Hunt was the owner of approximately sixty-five acres of land. By the 1898 deed, Hunt conveyed to defendant the surface, only, of this acreage, retaining the right to produce oil from six wells then on the premises, but stating in such deed that as fast as a well was abandoned Hunt would pull and remove the well, with all of its appurtenances, from the property. By this deed defendant became the owner of the entire surface right of the sixty-five acres, but Hunt remained the owner of the oil and gas right, subject to the limitation noted.

By the 1900 deed, Hunt conveyed to defendant the oil and gas right of the north sixteen acres, approximately, of the sixty-five acres, in consideration of $60. By this deed defendant, already the owner of the surface, became, to all intents and purposes, the owner of the fee of the sixteen acres, but Hunt remained the owner of the oil and gas right of the balance of the acreage, approximately forty-nine acres. The language of this 1900 deed is important. The description of the oil and gas right so conveyed fixes the south line at a point 600 feet north of Hunt's then northernmost well on the entire sixty-five acres, and parallel to the north line of the entire sixty-five acres. As a part of the consideration defendant released Hunt from liability to furnish gas for fuel and lights to defendant's nearby residence in Bolivar, as stipulated in the 1898 deed. This deed of 1900 contains the following provision: " As a further consideration said second party also agrees that the said W. J. Hunt may drill two more wells on the premises described in said deed [meaning the deed of 1898] above mentioned, one of said wells to be north of the stone quarry and one south of same and north of well now on west line but no well to be drilled within 600 feet of the south boundary of above described premises [meaning the north 16 acres]." This provision is important, as, by it, plaintiff insists that the restriction, of which he now claims the benefit, originated.

Defendant, in 1907, by warranty deed, conveyed the foregoing oil and gas right, only, to Price, Corbin and Root, describing the north sixteen acres by the same description as in the deed from Hunt to him. Apparently defendant had drilled oil wells on the north sixteen acres after the conveyance in 1900, from Hunt to him, and at the time of the conveyance in 1907, had at least six producing wells then on the property. These six wells explain the difference between what defendant paid Hunt, $60, and what Price, Corbin and Root paid defendant, $5,600. In this deed of 1907, is this recital: " It is understood and agreed that no wells shall be drilled within 600 feet of the south boundary of the above described premises." This clause is likewise important because plaintiff, by tying it into the 1900 deed of Hunt to defendant, insists that the latter, thereby, gave written evidence that the provision in Hunt's deed of 1900, to defendant was intended to create a restriction on Hunt's right to drill in the restricted area, and to make this restriction appurtenant to the oil and gas right of the north sixteen acres, and that defendant, by his deed of 1907, to Price, Corbin and Root, intended to convey and assign to them his right to enforce it, as against Hunt.

By various conveyances, all of them using the same description and containing the same provision as to drilling within the restricted area, title of the oil right to the north sixteen acres became, in 1932, completely vested in this plaintiff. In 1915, defendant, by quitclaim deed from Hunt, became the owner of the oil and gas right underlying the entire sixty-five acres, excepting that underlying the north sixteen acres.

Plaintiff's position in this lawsuit, insofar as he seeks an injunction against defendant, is, that defendant stands in the same position as Hunt would be, if he had remained the owner of the oil and gas right of the restricted area, since defendant, by his conveyance from Hunt in 1915, took with notice of the two deeds by which the restriction as to drilling on the restricted area came into being, and since plaintiff, as a subsequent grantee, must be deemed to have acquired his title, with notice of the existence of the restriction, he, now, can enforce this restriction against defendant.

Defendant's position is, that Hunt and defendant, the parties to the 1900 deed, never intended to create either a covenant, or a restriction, in favor of the oil right on the north sixteen acres, but that, on the contrary, it was a mere personal privilege which defendant accorded to his grantor to drill two additional wells, and which, had Hunt died before exercising, would have ended with his death, and that the provision found in defendant's deed of 1907, to Price, Corbin and Root was a mere rephrasing of the same privilege as accorded to Hunt by defendant, and that the only reason it was placed by defendant in his deed of 1907, to Price, Corbin and Root, was because Hunt had not yet exercised the privilege, and so, defendant merely gave notice that he still recognized Hunt's right to drill two additional wells.

The question posed is a troublesome one, not free from doubt. Concededly whatever restriction was contained in the deed from Hunt to defendant, of the surface, in 1898, was clearly for the benefit of the surface, only, as defendant then owned no oil right to be benefited. While it is true that by the 1900 deed defendant acquired the oil right of the north sixteen acres, it must be kept in mind that he, by the 1898 deed, then owned the surface of the entire sixty-five acres. Two years later when defendant acquired the oil right of the north sixteen acres, he must have intended to drill thereon, for within the next seven years he drilled at least six wells. In 1907, there were no wells on the restricted area. Under such circumstances, it is plausible at least, that the restriction had no relation, whatever, to the oil right on the north sixteen acres, but was solely for the

benefit of the owner of the surface right, defendant, in order to keep this restricted area free from any wells, which would interfere with its use as farm land.

Moreover if the restriction was intended to protect the oil right of the north sixteen acres, it was a most unusual one. At that time, in the Pennsylvania oil industry — the Allegany County field produces Pennsylvania crude oil — it was generally assumed that an oil well would drain the oil sand within a radius of 200 feet from the well. As plaintiff's witness Sawyer testified, it was not unusual for two adjoining owners to keep back from the dividing property line 200 feet and to space their wells on their own property 300 feet apart. Yet if this provision be construed as a covenant exacted from Hunt by defendant, for the protection of the oil right which he was then buying from Hunt, defendant was insisting that Hunt keep back, not 200, but 600 feet, from the property line .of the oil right of the north sixteen acres, a restriction three times as great as ordinarily deemed necessary. Possibly, too, as defendant's counsel suggests, defendant may have had in mind acquiring at some time in the future, the oil right of the restricted area.

Nevertheless, no matter how plausible defendant's argument may be, the fact remains that there is nothing definite to explain why, when defendant conveyed, in 1907, he provided in that deed that no wells were to be drilled within 600 feet of the south line. Concededly the provision is clumsily worded because, on its face, it would apply to the grantees, only, for defendant, in 1907, owned no oil right south of the south line of the sixteen acres. The oral testimony indicates that the restriction was not intended to apply against the grantees in the 1907 deed, but in their favor, for defendant never objected when wells were drilled on the 600 feet north of the south line of the sixteen acres. Moreover, although he became the owner of the oil right in the restricted area by Hunt's deed to him in 1915, so that, as the owner of the oil and the surface rights, he could have drilled on the restricted area, he did not do so until 1946. So, despite the troublesome nature of the question, we have reached the conclusion that, by Hunt's deed of 1900, to defendant, an equitable restriction was created in favor of the owner of the oil right of the north sixteen acres, namely, the defendant, which forbade Hunt to drill any oil wells in the restricted area, and that defendant intended to convey to his grantees his right in that equitable restriction. Plaintiff, as the successor in title of Price, Corbin and Root, now is the one entitled to enforce this restriction as against defendant,. who has succeeded to Hunt's title to the oil and gas right of the restricted area.

While we have reached a conclusion as to the construction of the 1900 and 1907 deeds at variance with that of the trial court, who determined that there was no equitable restriction created by the deeds of 1900 and 1907, which forbade Hunt, or this defendant, as successor to Hunt's title, to drill oil wells in the restricted area, it does not follow from such conclusion that, on this record, plaintiff is entitled to injunctive relief, for that is all the relief he could possibly obtain, on this record. While he asks, in his complaint, an accounting from defendant, of the oil which defendant has produced from the well drilled in 1946, in the restricted area, plaintiff is entitled to no such accounting. The oil which defendant has produced belongs to him, not to plaintiff, who has no title to it. All that plaintiff could possibly have, on this record, would be an injunction, as he has offered no definite testimony justifying the award of more than nominal damages. So, despite our construction of the deeds of 1900 and 1907, a court would not be required to grant an injunction if, owing to changed conditions, it would be inequitable and unreasonable to do so.

That there has been, since the years 1900 and 1907, when this restrictive covenant originated, a complete, radical and revolutionary change in the production of Pennsylvania crude oil in the Allegany and Bradford fields, which, together, produce, of the daily average production of about 65,000 barrels of Pennsylvania crude oil, the Allegany field, about one sixth and the Bradford field a little better than one half, is a fact evidenced, to some extent, by the present record. The completeness of the change in conditions is much more fully understood and appreciated throughout the Pennsylvania oil industry, by those engaged in it, than the instant testimony discloses.

The Bradford oil field lies principally in McKean County, Pennsylvania, with a small portion in the extreme southern part of Cattaraugus County, New York. Adjacent to the main structure are two small fields showing the same oil sand characteristics. The total acreage is about 92,000 acres. In this field, practically all the oil has been, and is now being produced from what is known as the Third Bradford sand. It is really permeable sand rock, but known in the trade as sand. While some oil was produced in McKean County prior to 1875, it was in that year that the so-called Bradford boom started. It reached its peak about 1881. In these early days of the boom in the Bradford field the pressure of the immense amount of gas, also in the oil sand, forced the oil from it so that it could be pumped to the surface. Indeed, some of the very early

wells flowed due entirely to the gas pressure. As the field developed thousands of oil wells were drilled. Gradually the gas or rock pressure in the entire field declined. No method was then, nor until many years later, known, whereby the oil could be forced out of the sand, except by the pressure of the gas in the sand itself. With the drilling and producing from the large number of wells drilled in the field in the early days, not only was the oil content of the sand materially lessened, but what was worse, the gas pressure steadily lessened. As a result the production in the field steadily began to decline. The cost of drilling new wells and operating old wells, the production from which steadily lessened, made the oil business of small value, as compared with the large returns of the boom days. At the turn of the century, for a number of years before and after, the general opinion in the field was that the industry was doomed. That pessimistic view continued until a short time prior to 1915, when the present method of production, known as flooding, began to be practiced.

The Allegany field consists of about 60,000 acres in the southern part of Allegany County. This field may be said to have really opened, as to development, with the discovery of oil at Richburg, New York, a few years after the opening of the Bradford field in 1875. The producing rock stratum or oil sand in this field is commonly known as the Richburg sand and possesses generally the same characteristics as the Third Bradford sand. It is found at approximately the same point with reference to sea level, as is the Third Bradford sand, taking into consideration the variation due to regional dip which is found in the Appalachian area. It produces the same grade of Pennsylvania crude oil as the Bradford field. Just as in the Bradford field, oil production in the field developed rapidly, but soon reached its peak. As in the Bradford field, by the turn of the century, due to the enormous initial production tending to exhaust the oil content of the sand, with the concomitant constantly declining gas pressure, the field was generally considered as destined, in the not too far distant future, to be completely abandoned as an oil producing area. This pessimistic view of the industry is evidenced by the fact that, in 1900, defendant bought the oil right of the north sixteen acres for $60. This same oil right today, had the sixteen acres not been subjected to flooding operations, would have been worth many thousands of dollars, having as it does, eighteen feet of Richburg sand, and if it had never been flooded, an estimated recoverable oil content of perhaps 40,000 barrels. The present

price of Pennsylvania crude is $5 per barrel delivered on the property. The practice and principles of oil production is the same in the Allegany field as in the Bradford field.

The gloomy outlook as to the future of both fields continued until a short time prior to 1915, when the present method of producing oil, by flooding the oil sand with water, began to be practiced openly. Undoubtedly prior to that time flooding had been used clandestinely, to a small extent. However, it was looked upon as a vicious and condemned practice, if not an illegal one. Chapter 217 of the Laws of 1879, now sections 308–310 of the General Business Law, if it did not make flooding, in express terms, illegal, did so impliedly. In fact it was not until the amendment of section 308 of the General Business Law in 1919 (L. 1919, ch. 252), that the implied illegality of the practice was removed. In Pennsylvania there were similar statutes designed to prevent flooding of the oil sand which, during the approximate period of the amendment of our own statute, were similarly amended, so as to recognize flooding.

Flooding completely revolutionized the entire industry. While geologists knew that the primary production of the two fields, dependent solely on the gas pressure, had not by any means exhausted the oil content of the sand, it was not until flooding began and gradually developed, beginning first with the so-called circle flood, then the line flood, then culminating finally, about 1927, in the present five-spot pressure method, credit for which is generally given in both fields to Arthur E. Yahn, president of the Messer Oil Corporation of Olean, New York, one of the largest producers of Pennsylvania crude oil, that there was any known means, other than the gas pressure in the sand, of forcing the oil from the rock.

The five-spot pressure method is now in general use by the producers of the great bulk of oil in both the Allegany and Bradford fields. It was perfected by the Messer Oil Corporation about 1927, in the Allegany field near the instant property. It consists in placing four intake or water wells at the four corners of a square, the sides of which vary from 250 feet to 450 feet, depending upon the porosity and permeability of the sand. These water wells are drilled and "shot" with nitroglycerin similar to the method used in completing an oil well. A pocket of from 25 to 40 feet is drilled below the producing formation in both types of well to act as a collecting pit for caving shale and sand, and in the case of an oil well, as a reservoir to hold the oil from which it can be pumped to the surface of the ground. In most cases a perforated liner is set

on the bottom of the pocket extending upward and to the top of the producing formation in both types of well. On the completion of a water well an anchor type packer attached to sufficient two-inch tubing or pipe running from the top of the well to the top of the perforated liner is then placed in the well. The packer is then set and cemented into place. The purpose of the packer is to confine the water, which will thereafter be forced through the tubing into the oil sand, between the bottom of the pocket and the packer itself. Water under pressure is then pumped into the tubing at the top of the well and passes through it and through the packer into the liner. It escapes through perforations in the liner into the oil sand completely surrounding the liner. The pocket is drilled through a slate formation which is not permeable by either oil or water. As the depth of the instant wells from the ground surface to the bottom of the sand is indicated by the record as something in excess of 1,200 feet, a flood well when filled with water, would contain a column of water of that height. Water is constantly forced into the well under pressure, at the well head or top of the ground surface, of from 300 pounds per square inch to 1,200. This is added pressure to the static pressure of the water column itself. Experience has taught the operator to filter and treat this water, in order that by sediment or chemicals in the water, the pores of sand be not closed. Placed in the center of the square is the output or oil well. The distance of this output or oil well from the four water wells depends upon the length of the square's sides.

The whole theory of flooding is to flush the oil from the sand. The water passes in ever widening circles from the intake water wells and slowly forces ahead of it, by flushing from the pores of the oil sand, the oil content into the pocket immediately beneath the oil sand of the central output oil well. This output oil well has no packer as in the case of the four water wells. This, in a general way, is a description of the modern five-spot pressure method, used in producing Pennsylvania oil. Of course the only oil forced into the central output oil well is that lying within the boundaries of the square. Each successive five-spot requires but two additional water wells and the central output oil well, to complete. This is the method now in general use throughout both the Bradford and Allegany fields.

Plaintiff stated that he was familiar with the five-spot method, and indicated that it was the generally accepted and customary method of operating in the Bolivar field, and that, while he had applied this system of water flooding, it was not as a regular

five-spot, but, as plaintiff expresses it, "more of a hit and miss five spot," but that still, by his water wells, water was forced into the oil sand under pressure in an attempt to force the oil in the direction of his output or oil wells, along his south boundary.

Wells subjected to water pressure flooding are normally assumed to produce, if drilling has been done in a proper manner, all the oil recoverable by pressure flooding from the area affected by the flood, within six to ten years on the average. As a matter of fact, if the flooding operation is properly conducted, and the intake or water wells properly placed, and the output or oil wells properly located, the latter drilled timely enough ahead of the flood to receive its full benefit, these output or oil wells are found to produce at least 60% of the oil which can be recovered from the area flooded, before the flood waters reach the output wells. Depending on the permeability of the sand and the distance from the water wells, the flood will reach the output oil wells in from twelve to twenty-four months.

Insofar as plaintiff's property is concerned, it is rather difficult, from this record, to see what damage is being done to his property by the single well which defendant has drilled on the restricted area. That the effect of plaintiff's flood has been to force oil from his land into the oil sand of the restricted area, and that defendant is receiving benefit from that flood, are self evident. However, plaintiff can never recover a barrel of that oil which has been forced from his property onto the restricted area, unless defendant, who is now the owner of it, were to drill on the restricted area a line of water wells some distance south of the south line. Plaintiff, himself, could have prevented this, had he located his flood along the south line, as he would have had a right to do.

The record indicates that plaintiff's three water wells are approximately 200 feet north of the south line, and were drilled in 1943. Three pressure floods have been working in this north sixteen acres beginning with approximately the years 1928 or 1929. The fact that plaintiff's third line of water wells was located where it was would indicate that he then believed, in 1943, that the only part of his property undeveloped was practically the south 200 feet of the original 16 acres, or, approximately, four acres. He located, in 1944, 1945 and 1946, six oil wells along the south line of his property. They would seem to be all that would be necessary to gather effectually and produce all the oil that this line of water wells could force into them. However, there are some statements of his witness Sawyer

which indicate that he drilled too late, because this witness, who drilled five of the six oil wells, states that the water had already passed at least two of them. He should know, as he drilled into the sand, and would know whether they were then making flood water. Plaintiff gave no information as to their condition at the time of the trial. If they were then making water, or are now, it is perfectly evident that plaintiff has already recovered from this south part of his property, which is the only part which could possibly be affected by any operation on the restricted area by defendant, at least two thirds of the recoverable oil. If we take, as the recoverable content, the statement of his own witness, Sawyer, 2,500 barrels per acre, then there were not, in 1943, when he drilled the last line of water wells, at the most, more than 10,000 or 12,000 barrels of oil which he could ever have recovered by flooding, the only known method by which this oil could be produced with profit. If the water has already passed his oil wells, as one might be led to believe from a reading of Sawyer's testimony, having in mind the usual rate at which flood waters under pressure migrate, then the remaining oil content to be recovered, at the very most, would not exceed 3,000 to 4,000 barrels of oil, and probably much less.

On the other hand, even if we assume that by reason of the fact that plaintiff, by his flooding operations, has rendered it impracticable for defendant to recover, now, from the restricted area all the oil underlying it, amounting by the same yardstick to about 30,000 barrels of oil still he could operate the major part of the twelve acres without damaging plaintiff in the slightest. If we were to utilize the testimony of plaintiff's witness Sawyer, not only could defendant operate two thirds of the restricted area without harm to plaintiff, but such operations would actually benefit him, for Sawyer says that a line of pressure water wells 200 feet south of plaintiff's south line would force back onto plaintiff's property, the oil which had been pushed over by plaintiff's flood. That testimony of Sawyer may to some extent be correct. Such a back pressure flood might not only push back onto plaintiff a portion of the oil which his flood had pushed onto the restricted area, but in addition, a part of defendant's oil in the same area, which the defendant owns as owner of the fee in the property. His oil has become intermingled with the oil forced by plaintiff's flooding operations into the restricted area.

Another feature important as bearing upon what may be a proper judgment herein, is the fact that, as far as the record

discloses, defendant has flooded no part of his property, and so has not invaded the restricted area. On the contrary, it was plaintiff who, utilizing flood methods to develop his own oil right, has flooded the oil sand in the restricted area. In addition, that sand has undoubtedly felt the effects of floods from the two producers adjoining on the east and west. It is a generally accepted fact, as to flooding, in both fields, that once flood waters have permeated the oil sand, the same amount of oil can never be recovered, as would have been recoverd, had the sand never been subjected to the encroachment of flood waters.

From what has been stated we believe that enough appears warranting the conclusion that this case should be governed by the rule stated in decisions such as *McClure* v. *Leaycraft* (183 N. Y. 36, 44) and *Batchelor* v. *Hinkle* (210 N. Y. 243, 250, 251) namely, that where the circumstances existing when the covenant is sought to be enforced by an injunction, are no longer effective for the purpose the parties had in mind when they made it, an injunction which would bear heavily on defendant, without much benefit to plaintiff, ought not to be granted, but instead, plaintiff should be left to his action at law to recover his damages.

Nor do we consider that the rule stated in *Marvin* v. *Brewster Iron Mining Co.* (55 N. Y. 538, 551) has any application to the present situation, if, for no other reason, than that it is this plaintiff who, by adopting flooding as the method of producing oil from his own property, has produced the situation where the restriction is not, and cannot be utilized by him. The restriction was never intended for the use he now seeks to make of it. It was, at the best, designed to prevent the drilling, within 600 feet of the south line, of so-called natural wells into which the gas pressure in the rock would force the oil. Plaintiff, under that view of the restriction, could drill such natural wells near his south line, with no well nearer to them on the south than 600 feet. Of course plaintiff could not, now, utilize the restriction for that purpose because such wells would not produce enough oil to pay for the drilling, since the gas pressure is practically gone. Certainly Hunt, when he made this restriction, never intended that the restricted area should be a reservoir, into which the flood waters of plaintiff and the adjoining owners on the east and west could be dumped. Hunt still remained the owner of the oil right of this area.

Moreover flooding cannot be treated as a mere improvement in the production of oil, for the present method employed is too revolutionary in character. It is one which would have been

considered vicious and illegal at the time when the restriction herein considered originated. It goes without saying that such a restriction would never have been made by Hunt, or asked by defendant, had either believed, at the time it was made, that oil would be produced by present day methods.

A decision of Judge JOSEPH W. BOUTON, Judge of the Court of Common Pleas of McKean County, entered in the McKean County Prothonotary's Office September 6, 1930, in the case of *Soule* v. *Petroleum Reclamation Company,* is of some interest as indicating the view of a judge who had lived practically his entire life in McKean County, in which the greater part of the Bradford oil field is located, as to the radical change made by pressure five-spot flooding. He granted to Soule, a mortgagee, who had sold his property to defendant, taking back a long term mortgage, an injunction forbidding defendant to pump the water into the intake or water wells under pressure. The basis of his decision was that such a change in production could not have been contemplated by the parties at the time the mortgage was given, because of the radical change it (pressure flooding) made in the production of oil. While an appeal was taken by defendant to the Supreme Court of Pennsylvania, it was subsequently abandoned.

Accordingly, if the one well in question was the only one which might ever be drilled by defendant on the restricted area, we would be inclined to affirm this judgment and leave plaintiff to his remedy at law to recover his damages, whatever he might be able to show. We are not impressed by the testimony that this one well does much damage to him, nor that such damage cannot be measured.

However, if the restricted area is to be developed and the economic waste of the oil underlying it avoided, it is clear that such an affirmance of this judgment might lead to much more litigation, as each well that defendant might hereafter drill could conceivably give rise to another lawsuit.

A judgment might, even on this record, possibly be made, if we were to adopt the testimony of Sawyer, which would permit defendant to operate the south 400 feet of this area, without harm to plaintiff, but on the contrary, benefiting him, provided defendant drilled no output oil wells between the line of water wells, suggested by Sawyer, 200 feet south of plaintiff's south line, and said south line. However, this record is inadequate to warrant any such judgment. Moreover, this testimony of Sawyer is too doubtful to be credited without further testimony.

Apparently it was volunteered by him. At least plaintiff made no attempt to elaborate upon it. Certainly defendant offered no proof upon the propriety of such a judgment. Both should have opportunity to do so before such a judgment is made. Many factors would enter into the propriety of such a judgment. We have nothing to show the condition of plaintiff's property. While the present record discloses that it has been under rather intensive flooding for nearly twenty years, and that three floods, including that of 1943, have operated on the property, so that one might conclude that there is not much economic life left in the property, still, after all, the parties should be heard on that question, as it would bear, not only on the right to an injunction, but also, if an injunction be denied, and defendant permitted to operate his property as he saw fit, on whether an action for damages would be adequate relief to the plaintiff.

Another factor which, conceivably, may enter into the final and just determination of the rights of these parties, would be the distance plaintiff's flood has migrated into the restricted area. The condition of plaintiff's wells, whether they are pumping water, how much and for how long, and especially that of the one well of defendant now on the restricted area, would cast light on that feature. The record discloses nothing as to the time when the floods on the east and west sides of the restricted area were put in, and how far from the line and under what pressure. These, again, are all factors which should be known if a judgment were to be made, finally determining the rights of the parties.

In the light of the foregoing observations we conclude that the proper course is to reverse the judgment dismissing plaintiff's complaint, and remit the parties to another trial of the issues. On such a trial every issue which was present on the first trial will be open, as our determination that the two deeds of 1900 and 1907, created a restriction on Hunt's right to drill in the restricted area, and so, on defendant's right, is based solely upon the present record.

Passing now to the consideration of the counterclaim, this involves a determination of where plaintiff's disputed well C is located, whether north of the south line of his property or south of it. This, in turn, is tied into the location of the south line of plaintiff's property which, as fixed in the 1900 deed, was a line parallel to the north line of the property and 600 feet north of the northernmost well then on the property of the

grantor Hunt. The only definite testimony as to this well was given by plaintiff's witness Sawyer. The record is not any too clear, but indicates that at a point near what must be the south line of the restricted area the easternmost of three old wells now there, was, in 1900, or 1901, or 1902 (Sawyer was indefinite) then the only one of those three wells in existence, and was the northernmost well on Hunt's property.

Since defendant claims that the present northernmost of these three wells was, on January 16, 1900, the date of Hunt's deed to him, the northernmost well on Hunt's property, it is quite evident that Sawyer's testimony becomes extremely important. Militating against his claim that the easternmost of these three old wells was, in 1900, or a year or two later, the northernmost well on Hunt's property, is the fact that Sawyer, and not plaintiff, was the one responsible for the location of this disputed well C. In 1944 and 1945, he drilled five oil wells for plaintiff just north of what was evidently assumed to be the south line of plaintiff's property. In 1946, Sawyer's son drilled a sixth oil well for plaintiff just north of the southern boundary of plaintiff's property.

Some time, not definitely shown, but evidently prior to 1944, plaintiff drilled well A in the southeast corner of his property. The location of the seven wells is shown on the map made by plaintiff's surveyor. As one looks at this map he is struck at once by the fact that the only well about which any question could be raised, as located on the restricted area, is well C. Except that well, the other six are quite substantially in line and well to the north of the south line. If Sawyer's testimony is correct, since both parties concede that one of the three wells which are still in existence along the southern boundary of the restricted area was the northernmost well on Hunt's property on January 16, 1900, then the present easternmost well was the only well there in 1900, or a year or two later, when Sawyer claims to have drilled a well for Hunt at another place on his property. If that be true, since the other two wells are north of the easternmost, then concededly Hunt must have violated this restriction in his deed of January 16, 1900, by drilling these two wells.

While defendant's witness Shaner, who drilled two wells for Hunt sometime between 1900 and 1910, is indefinite and hazy, yet it is inferable from his testimony that when he did drill in that period, the two wells for Hunt, these same three wells now near the south boundary of the restricted area were then on Hunt's property. Moreover, defendant's deed of 1907, of the

oil right on the north sixteen acres, to Price, Corbin and Root, indicates that, at the time that deed was executed, Hunt had not exercised his right to drill two additional wells, accorded to him by his deed of January 16, 1900.

If these inferences, which seem reasonable, be drawn from this testimony, then Hunt violated the restriction in his deed of January 16, 1900, in two respects: (1st) By drilling two wells after the 1900 deed, and prior to the time Shaner drilled two wells for Hunt between 1907 and 1910, north of what was then his northernmost well; and (2d) By causing Shaner, between 1907 and 1910, to drill two additional wells which, after they were drilled, would make ten producing wells on Hunt's property, although concededly by his two deeds to defendant, of 1898 and 1900, he was limited to eight wells. If this disputed well C was not drilled on plaintiff's property, since Sawyer's testimony indicates that he was the one responsible for changing its location, after plaintiff and he had located it approximately thirty feet north of where it is now, that fact, coupled with the circumstances, to which reference has just been made, tends to cast doubt on Sawyer's testimony, for he is the one responsible for the error, if it is one.

When the testimony of the three engineers, two sworn by defendant, and one by plaintiff, is analyzed, it becomes again apparent that, even though the present easternmost of the three wells be taken to locate the south line of the restricted area, the variance between the testimony of these engineers arises largely in the location of the north line of the entire Hunt property. If plaintiff's engineer's running of this line is the correct one, and if surface measurement be accepted as the proper measurement to determine the boundaries of the restricted area, and the present easternmost of the three old wells be taken as the starting point, plaintiff's well is approximately ten inches north of his south line, although all three engineers agree that by accurate instrument measurement the disputed well C is on the restricted area.

In the light of the testimony of plaintiff's engineer it is apparent that, unless his unchecked surface measurement, which he stated was inaccurate, but which by rechecking, he could have reduced to accuracy, be taken, defendant should have succeeded on his counterclaim. It is clear that the 15th finding of fact in the decision, namely, that a well-known and well-recognized method of measurement in the Bolivar (Allegany) field is surface measurement, and that by surface measurement the southernmost well in operation by plaintiff is being operated on plain-

tiff's land, was a most essential one. We conclude, as to that finding, that there is insufficient evidence to warrant it. As far as this record discloses, it is based largely upon statements of the various engineers sworn, to the effect that in examining descriptions in old deeds, frequently it is impossible to reconcile them with instrument measurements. That difficulty might well be found in any area, outside the Allegany oil field and even in urban areas.

Moreover sight seems to have been lost of the fact, since nothing in respect thereto is shown by the record, that this restriction as to drilling had nothing to do with the surface, but related to the Richburg sand alone, the producing oil formation, the surface of which was approximately 1,200 feet below the ground surface. If the restriction is to be deemed one to protect the oil right in the sand of the north sixteen acres, then it meant that no well was to be drilled into the Richburg sand within 600 feet from the south boundary of that oil right. The commonly accepted idea has always been that the top of the Richburg sand, no matter what might be the character of the ground surface, was substantially level. If so, then surface measurements would be wholly inapplicable to a situation, such as we have presented here.

Accordingly, we reach the conclusion that the court's determination that plaintiff's well C is not located on the restricted area, is against the weight of evidence.

The judgment dismissing the complaint and the counterclaim should be reversed on the law and facts, without costs to either party, and a new trial directed.

All concur. Present — McCurn, Larkin, Love, Vaughan, and Kimball, JJ.

Judgment reversed on the law and facts and a new trial granted, without costs of this appeal to either party.