38

In the Matter of ENVIROGAS, INC., Petitioner, v RODERICK G. W. CHU et al., Constituting the New York State Tax Commission, Respondents. (Proceeding No. 1.)

In the Matter of NATIONAL FUEL GAS DISTRIBUTION CORPORATION et al., Petitioners, v RODERICK G. W. CHU et al., Constituting the New York State Tax Commission, et al., Respondents. (Proceeding No. 2.)

Third Department, January 9, 1986

**APPEARANCES OF COUNSEL**

*Hodgson, Russ, Andrews, Woods & Goodyear (Daniel M. Darragh* of counsel), for Envirogas, Inc., petitioner.

*Phillips, Lytle, Hitchcock, Blaine & Huber (Paul Taylor* of counsel), for National Fuel Gas Distribution Corporation and others, petitioners.

*Robert Abrams, Attorney-General (Nancy A. Spiegel* and *Wayne L. Benjamin* of counsel), for respondents.

**OPINION OF THE COURT**

YESAWICH, JR., J.

Envirogas, Inc., petitioner in proceeding No. 1, and National Fuel Gas Distribution Corporation and National Fuel Gas Supply Corporation (hereinafter collectively referred to as NFG), petitioners in proceeding No. 2, are engaged separately in extracting, producing and distributing natural gas in western New York. Through leases with local landowners (hereinafter lessors), Envirogas and NFG obtained the exclusive right to explore for and extract gas from the leased parcels. Though not uniform, the leases generally state that when a producing well is developed, the lessor is to receive a royalty of one-eighth the value of all gas produced and marketed off the premises.

Each lease also contains a "free gas" clause. Essentially, this clause provides that if a productive well is completed, the lessor "reserves" or "excepts and reserves" or "shall have" the right to a certain amount of free gas, either 150,000 or 200,000 cubic feet annually, for domestic use. Responsibility for tapping into the wellhead to obtain the gas usually rests with the lessor. In lieu of this arrangement, some lessors receive cash payments or, if their home is already tied into

the local distribution system, "free gas" through the existing system. In the latter instance, Envirogas and NFG absorb the cost of the gas.

Being of the view that the "free gas" clauses effect a taxable exchange, the Audit Division of the Department of Taxation and Finance notified Envirogas in 1981 and NFG in 1978 that unpaid sales tax was due on those transactions. The deficiency assessed against Envirogas asserted also that sales tax was due on various materials, equipment and vehicles it had purchased and used in conjunction with its gas operations. Both companies protested; separate hearings resulted in re-ductions in the assessments, but the modifications made do not bear on the issues before us. Envirogas and NFG then each commenced a CPLR article 78 proceeding to overturn the State Tax Commission's determination.

The thrust of petitioners' argument is that because the leases reserve "free gas" to the lessors, petitioners never acquire title to the reserved gas; therefore, receipt of that gas by the lessors is not a taxable sale within the meaning of Tax Law § 1101 (b) (5). As for the Commission, the rationale underlying its determination is that while some States view an oil and gas lease as transferring oil and gas in place to the lessee (see, 38 Am Jur 2d, Gas and Oil, § 67, at 539-540), under New York's "rule of capture" title to subsurface oil and gas vests in the party which first brings it to the surface and reduces it to possession (Wagner v Mallory, 169 NY 501); since the leases grant petitioners the unconditional and exclusive right to extract gas from the lessors' property, they are endowed with title to the gas absolutely as soon as it reaches the surface through petitioners' wells and, hence, the free gas clauses necessarily involve a transfer of possession of the gas to the lessors, a transfer constituting a taxable sale.

We find the Commission's determination both reasonable and rational. Initially, we note that its decision is compatible with the leases themselves. At the outset, they provide for transfer to petitioners of full title to all the gas under the lessors' property; later, in that portion of the lease dealing with consideration, a specified amount of free gas is then allotted for the lessors' domestic consumption. Imposition of a sales tax on the premise that petitioners transfer possession of some of the gas owned by them in return for the right to remain on the land to produce gas is obviously justified.

Petitioners' contrasting argument is not only inconsistent

with the express language of the leases, but is at odds with the New York rule of capture since ownership of the land does not entail ownership of the gas. Nor does the common lease provision transferring the exclusive and unconditional right to extract gas suggest a reservation in the lessors of ownership of the gas. Moreover, the leases refer to the "privilege" of receiving free gas, condition usage on the lessors' conformance with "reasonable rules and regulations of" petitioners, and allow petitioners to discontinue the lessors' use of free gas if their usage interferes with petitioners' operations.

It is also noteworthy that the lessors have no right to their allotment of gas unless they utilize it. If the lessors do not consume any gas, petitioners are not obliged to set the unused portion aside or, alternatively, to compensate the lessor therefor. This circumstance lends additional substance to the conclusion that title to the gas is in petitioners until it is consumed by a lessor, at which point, as the Commission found, a transfer of possession, and hence, a sale, occurs.

Envirogas contends also that the tax found due on the free gas was incorrectly calculated both as to price and volume. With respect to the price, the Commission directed the Audit Division to recompute the tax to reflect a cost of the first 400 cubic feet per month to be $2.30 (this, according to the supervisor of Envirogas' land department, was the average of the approximate seasonal values of the gas at the wellhead). As for free gas supplied in excess of 400 cubic feet, the retail rate, which was considerably higher than the wellhead price, was deemed appropriate. Envirogas maintains that the wellhead price should have governed throughout. While this may be true, Envirogas failed to introduce any evidence establishing that price. Given the insufficiency of Envirogas' proof, the Commission was at liberty to fix the amount of tax liability based on the record information before it (see, Tax Law § 1138 [a] [1]; Matter of Day Surgicals v State Tax Commn., 97 AD2d 865, 866-867).

To estimate the volume of free gas consumed by the lessors, the Audit Division assumed that all 112 of Envirogas' wells located in New York on February 20, 1980 were providing the maximum yearly amount of "free gas" during all three years of the audit period, March 1, 1977 through February 29, 1980. Envirogas' failure, though afforded the opportunity to do so, to introduce any evidence to the contrary moved the Commission to approve the Audit Division's assumption. While the method applied was indeed imprecise, in light of the very limited

information available and Envirogas' refusal to provide the auditor with any records, it was an estimate reasonably calculated to reflect the tax due.

Envirogas next challenges the levying of a sales tax on its acquisition of certain machinery and equipment. In the years at issue, Tax Law § 1115 (a) (12) exempted from sales and use taxes receipts from: "Machinery or equipment for use or consumption directly and predominantly in the production of * * * gas * * * by manufacturing, processing, generating, assembling, refining, mining or extracting". Regulations amplifying this exemption distinguish production from administration or distribution (20 NYCRR 528.13 [b] [1]). In particular, production is defined as "starting with the handling and storage of raw materials * * * and continuing through the last step of production where the product is finished and packaged for sale" (20 NYCRR 528.13 [b] [1] [ii]); administration, on the other hand, includes activities such as "purchasing, maintenance, [and] transporting * * * raw materials and clerical work * * * such as preparation of work, production and time records" (20 NYCRR 528.13 [b] [1] [i]); distribution "includes all operations subsequent to production, such as storing * * * and shipping finished products" (20 NYCRR 528.13 [b] [1] [iii]). The regulations further advise that "[u]sage in activities collateral to the actual production process is not deemed to be used directly in production" (20 NYCRR 528.13 [c] [2]).

■ Applying the statute and regulations, the validity of which are not contested, the Commission fairly concluded that the service rig and attachments constituted machinery and equipment directly and predominantly used in production, but that snowmobiles, Hondas, trailers and pickup trucks used to transport personnel or equipment to the production site were not directly involved in production, but rather in administration. As for the heavy equipment employed to preliminarily construct and maintain the well sites and access roads thereto, and to construct the pipeline from the wellhead to the point of sale, the record shows clearly that this usage could reasonably be regarded as distribution. Furthermore, all the foregoing items, except for the service rig and its attachments, could well be considered to have been used in preparing for production or in an activity collateral to production.

However, two items, pumps and water trucks, were improperly included in the assessment. Pumps, as the Commission found, are "[u]sed during the production process to provide

water on location for the drilling and hydrofracture", and the water trucks "haul water to the production site for the drilling and hydrofracture procedures when there is no available water at the well site, to remove waste water and fluids used in the drilling and hydrofracture procedures, and to collect production brine water and other impurities removed from the gas". Because the essence of gas production is drilling, hydrofracture and removal at the well site of impurities in the gas, the pumps and water trucks come within the purview of the production exemption.

In 1981, Tax Law § 1115 (a) (12) was amended to confer the production exemption on "vehicles and associated equipment used in the drilling, production and operation of * * * gas * * * activities to the point of sale". Envirogas urges us to put the amendment into practice retroactively; we decline. Ordinarily, statutes operate prospectively unless a contrary intent is clearly manifested (*Kelly v Yannotti,* 4 NY2d 603, 606; McKinney's Cons Laws of NY, Book 1, Statutes § 51). Excepted from this customary rule are remedial statutes, those "designed to correct imperfections in prior law, by generally giving relief to the aggrieved party" (McKinney's Cons Laws of NY, Book 1, Statutes, p 79).

Significantly, this amendment did not even take effect immediately. Nor is there anything underlying its enactment suggesting that it was intended to be applied retrospectively. Beyond that, the legislative history contains no indication that the amendment's purpose was to clarify prior misinterpretations of the scope and extent of the existing exemption; indeed, what the history communicates is that the amendment was regarded as a questionable expansion of the sales tax production exemption (Governor's Memorandum, 1981 NY Legis Ann, at 449).

■ Lastly, Envirogas claims that its purchase of radio equipment used for communication purposes among its employees was exempt from sales tax. In support of its contention, Envirogas relies on that portion of Tax Law § 1115 (a) (12) which bestows the exemption on: "telephone central office equipment or station apparatus or comparable telegraph equipment for use directly and predominantly in receiving at destination or initiating and switching telephone or telegraph communication". This language itself evinces an exemption for equipment needed to maintain a telephone communications network, not every device enabling communication. And, as statutes creating tax exemptions are to be strictly circum-

scribed *(see, Matter of Grace v New York State Tax Commn.,* 37 NY2d 193) and the Commission's interpretation cannot be said to be implausible, its construction must be favored *(Matter of Johnson v Joy,* 48 NY2d 689, 691).

MAIN, J. P., CASEY and HARVEY, JJ., concur.

Determination in proceeding No. 1 modified, without costs, by annulling so much thereof as assessed sales tax on Envirogas, Inc.'s purchase of pumps and water trucks; matter remitted to the State Tax Commission for further proceedings not inconsistent herewith; and, as so modified, confirmed.

Determination in proceeding No. 2 confirmed, with costs.