OPINION OF THE COURT
Edward M. Horey, J.
INTRODUCTION
For decision is a condemnation proceeding brought under the provisions of the Eminent Domain Procedure Law. In the action the plaintiff, National Fuel Gas Supply Corporation, is the condemnor. It seeks by this action to have damages assessed against it for the condemnation of the defendants’ interests in that geological formation known generally as the Oriskany Sand formation which underlies certain acreage located in Allegany County known generally as the Beech Hill gas field. The cause for condemnation was the creation by the condemnor of a gas storage pool in the referenced geological formation under the referenced acreage.
The action was tried over a nine-day period in February 1988. It was well prepared by both counsel for plaintiff and defendants. Outstanding expert testimony was adduced. Detailed graphs, charts, maps and other exhibits were prepared totaling 70 in number.
As will be demonstrated the action was a most complex one, presenting extremely novel questions of fact and law for determination.
There were 16 wells in the Beech Hill gas field in which the well known as Ludden No. 1 was located. Excepting from consideration Ludden No. 1, not 1 of the other 15 wells produced gas for more than five years. In fact, the average time of production of those 15 wells was 24% months or slightly more than a two-year period.
In marked contrast the Ludden No. 1 well produced gas for 469 months (i.e., 39 years and 1 month) and was still producing gas in paying quantities at the time it was taken in condemnation on July 17, 1980.
*827 SOURCE OF COMMERCIALLY RECOVERABLE GAS
Essential to a determination of the case at bar is a determination of the source of the gas which was produced from the Ludden No. 1 well for over 39 years and was continuing to produce in paying quantities when condemned.
It was the unanimous opinion of the condemnees’ experts that the source of such gas was from a geological formation or formations lower than the Oriskany formation. Their opinion was that gas from such lower formations followed fault lines upward to the Oriskany formation in the area of Ludden No. 1 well and constantly regenerated such well.
The brief period of productive life of the other 15 wells in the Beech Hill field averaging as they did two years and one month contrasted with the productive life of the well in issue which produced gas in paying quantities in excess of 39 years and was still producing when condemned in 1980 argues strongly for a source other than the Oriskany formation and this court finds such facts to strongly support the contentions of the defendant condemnees’ experts.
Further supportive of the defendant condemnees’ contention and of their experts is the fact that when first drilled Ludden No. 1 showed evidence of salt water. Further, it was drilled in at a lower elevation than other wells in the immediate area. The significance of those two facts is that wells drilled further from the dome or high point of the Oriskany formation typically have shorter productive life and are the most susceptible to the withdrawal of gas from other wells. Such production lowers the gas pressure and thus more readily permits the intrusion of salt water. For facility of comprehension Oriskany gas wells in New York and Pennsylvania may properly be considered to be drilled on a sandy beach area not distant from the ancient sea. In New York and Pennsylvania salt water is always present in the Oriskany formation and typically it is within a few feet of the productive area of the formation. The natural gas found in the Oriskany formation is pressurized by the salt water. As the gas is withdrawn the water replaces the gas. When the replacement is complete the well ceases production of gas.
Thus, given the fact that Ludden No. 1 well had upon drilling a "show” of salt water and was drilled on a lower and perimeter area of the field, under typical circumstances it not only should have followed the course of the other 15 wells and "gone to water” as they did, but in fact it should have been *828 one of the first to do so. Ludden No. 1 did not do so and had not done so for a period of over 39 years when it was taken in condemnation.
The additional support for the defendant condemnees’ contention that Ludden No. 1 is the beneficiary of gas migrating from some lower geological formation into Ludden No. 1 is the report which was made by a team of geologists in 1967. That report was completed as a study for the North Penn Gas Company concerning the possibility of using the Beech Hill field as a storage area. The report was prepared after analyzing the independent studies made by the three geologists, viz., W. S. Leeper, R M. Sexton and C. R. Burkhardt, the latter being one of the geologists testifying in support of the defendant condemnees.
Under topic heading "Possible Migration”, this report made in 1967 antedating by 13 years the condemnation in issue disclosed the following significant information by way of conclusion of the three geologists, viz., "that Beech Hill received an influx of gas from an outside source. ” (Italics added.)
Certainly this report establishes that as of 1967 there was an observed marked excess of production from the Beech Hill field over that initially estimated and that despite production for 21 months there was an observed increase in field gas pressure. It was these observations that led three geologists working independently to conclude that the reason therefore supported the conclusions of "an influx of gas from an outside source.” Predating as it does by some 13 years the condemnation in issue, the bare minimum that can be said is that such report strongly corroborates the theory of the defendants’ experts of regeneration of gas in Ludden No. 1 from an outside source. Clearly the theory and opinions of the defendants’ experts were not conjured up from whole cloth for the purpose of trial. Rather they merely support the tentative conclusions reached by two other geologists 13 years earlier.
When pressed for his explanation of where the gas was coming from that was being produced by Ludden No. 1, Dr. Klins, the condemnor’s expert, his answers were vacillating, equivocal and uncertain. Initially his precise answer to the source of the gas being produced was "that the blocks themselves constitute the reservoir, that is the only explanation.” Implicitly as the record discloses such answer was intended to mean that the gas being produced was only the residual gas left in the reservoir after the other 15 wells had ceased *829 production. Dr. Klins was adamant that only the original estimated amount of gas was available for production. When it was demonstrated that the originally estimated amount of gas had long since been produced and substantially exceeded, the question of source was repeated as follows:
"Q. Therefore, certainly on the natural production predicated on the annual flow of the other fifteen wells in that area, it would have exhausted in 1948 as well, but it had not; forty years it continues. It continues to produce gas. Where does that gas come from? You told me that you didn’t think that it was coming from lower horizons. Where do you think that production is coming from? What could you theorize?
"A. I think it is from lower production or adjacent block, that’s all I can tell you. ” (Italics added.)
This latter answer was consistent with one of Dr. Klins’ earlier statements that he had "no disagreement with their [claimant’s expert geologists] interpretation that perhaps gas was migrating.” In sum, the court finds that unable to supply a comprehensible and reasonable explanation of the source of the gas being produced, Dr. Klins grudgingly admitted the possibility of migrating gas from lower horizons upward along fault lines to the well in issue. This is precisely the theory of the defendants’ experts, Burkhardt and Stead.
This court finds as a fact that the source of gas from Ludden No. 1 well is from a geological formation or formations lower than the Oriskany formation, the gas from which formations migrated upward along fault lines and continually regenerated such well.
AMOUNT OF COMMERCIALLY RECOVERABLE NATURAL GAS
The court turns next to a consideration of the amount of native gas in place which is commercially recoverable. In that connection, the court considers the reports and testimony of the expert witnesses, viz., Dr. Klins for the condemnor and Dr. Burkhardt and Mr. Stead for the condemnee.
First the court finds the report of Dr. Klins deficient and confusing in that he never made a calculation of the initial gas in place. What he did was to make a calculation of initial gas in place in 1948. If the calculations are of gas remaining in place as of 1948 it should be properly described as such and not denominated initial gas in place which it was so denominated in paragraph entitled "timing of future gas recovery.” The procedure adopted by Dr. Klins led to confusion in evalu *830 ating his report especially as to the remaining gas in place and the calculated volume and time of production thereof.
A calculation of initial gas in place is from a relatively simple equation. Initial gas in place is the total of gas produced and gas remaining for production.
In calculating the amount of initial gas in place only one factor is typically known. It is the amount of gas which has been produced since the well was drilled. In the instance of Ludden No. 1 the total gas produced from the time of drilling (1940) to the time of condemnation (1980) was 3,312,414 MCF. To compute the amount of initial gas in place there should be added to the figure of known production (3,312,414 MCF) the amount of gas remaining for production. This has to be a calculated or computed amount.
Dr. Klins arrived at his calculation of gas remaining for production as 677,191 MCF. He reached that sum by extending his plotted decline curve shown on his graph and calculated at .045733 for an annual decline in production of approximately 41á% annually. In truth and regretably Dr. Klins never portrayed graphically the decline curve past the year 1975 at a time when the production was at its lowest of 28,550 MCF annually. However, and nothing is more important than this, Dr. Klins computed the remaining gas in place after 1975 by mathematically continuing to use this decline curve of .045733 which the court has referred to for facility of comprehension as a decline curve of approximately 4ü% annually. Therein lies the error in his report. For the well in issue did not continue to decline in production at an annual rate of 4Vi% after 1975.
Rather production after 1975 increased at a dramatic rate. From a low in 1975 of 28,550 MCF the well increased in production as follows: 197^ — 44,699 MCF; 1977 — 75,497 MCF; 1978 — 95,227 MCF; 1979 — 87,017 MCF, and for the first eight-month period in 1980 of 68,079 MCF which figure projected at a monthly rate of 8,510 MCF over the full one-year period of 1980 would have produced 102,120 MCF.
This dramatic increase in production followed after repairs were made to the well by the claimant, Cunningham. In 1975 Cunningham removed a "drip” which was described as a device used to collect water produced from a gas well which had been installed by the North Penn Gas Company unknown to the plaintiif claimant. A leak in the gas line at a river crossing apparently resulting from a hole made by a tractor *831 was repaired in 1975 or 1976. In 1977 the "head” on the well was found to be leaking and it was also repaired by Cunningham. Following each of the repairs noted and continuing thereafter production from the well increased and was continuing to increase up to the time of condemnation in 1980.
The markedly increased production after 1975 placed Dr. Klins on the horns of a dilemma. This is for the reason that each year’s production after 1975 was substantially in excess of the annual production predicted by that expert. Clinging tenaciously, however, to his computation of 677,191 MCF as the amount of gas remaining for production as of 1975 computed at a decline curve of approximately 4A% annually, Dr. Klins solved the dilemma by increasing his annual decline curve from 4*A% to over 20% (precisely .20873). It must be recalled that this was done at a time when the production was not declining but rather inclining substantially. In the judgment of this court the expert’s solution was completely arbitrary. With the exception of the first two years’ flush production (1940-1942) the well in issue never had an annual decline curve that even remotely approached 20%. Dr. Klins should have adjusted his decline curve in the light of the proof of five years of increasing production after 1975 or alternatively have commenced a new curve as of that date. If he had done the latter the curve shown would not have reflected a decline rather it would show a dramatic incline. That expert’s failure to modify his opinion in the light of the uncontested evidence of five years of annual production after 1975 in excess of his prediction by approximately 300% renders his estimate of annual production disproven and in turn his estimate of gas remaining for production suspect.
On the contrary, the court finds factual basis to support the opinion of the claimants’ experts, viz.: Messers Burkhardt and Stead. As they noted the Ludden No. 1 well’s history of production has been unique. With 15 other wells drilled and depleted of gas in an average time of 24% months, the Ludden No. 1 well continued to produce gas in paying quantities for over 39 years until it was taken in condemnation. That undisputed history must be coupled with the proven fact that production increased following mechanical repairs from a low in 1975 of 28,550 MCF to 102,020 MCF as of 1980. At the time of condemnation production was not declining it was increasing annually. Most significant to this court is the fact that production of the Ludden well has always been attended with *832 a pressure which never dropped below 400 pounds per square inch.
It is the continuance of a pressure source that produces natural gas and also oil. It is elementary that when pressure ceases so does production. The southwestern counties of New York and the northwestern counties of Pennsylvania are replete with gas and oil fields with hundreds of thousands of feet of natural gas and tens of thousands of barrels of oil remaining in place but which are wholly unproductive because of the loss of pressure source. It is the partially successful practice of restoring a pressure source by injection of water under pressure that led to the success of the "five spot” techniques for secondary production of oil. (For historical review and development see Mallory v McDermott, 274 App Div 254 [4th Dept 1948, opn by Larkin, J., this Judge’s early legal mentor].) Similarly, partially successful practice of regenerating depleted oil fields has been initiated by the injection of gas under pressure. The success of these practices is related directly to the porosity and permeability of the particular oil or gas geological formation and its ability to respond to outside pressure sources. It is this factor of continuing pressure coupled with the over 39 years of proven production of gas in paying quantities that supports the theory and opinion of claimants’ experts that the well in issue was being continually "recharged” from a gas-producing geological "source deeper than the Oriskany”, the gas from which proceeded upward along geological fault lines to the Ludden well.
Upon the facts proven and for the reasons noted, the court accepts the opinion of claimants’ experts that as of the date of condemnation the Ludden No. 1 well would produce an average of 40,000 MCF of natural gas per year, for a period of 20 years. The court further accepts such estimate to be a conservative one.
The court finds as a fact that as of the date of condemnation there remained for production in paying quantities 800,000 MCF of natural gas in Ludden No. 1. Under the statute the claimants must be reimbursed for the value of this loss. (See, ECL 23-1303 [5].)
VALUE OF COMMERCIALLY RECOVERABLE NATURAL GAS
The court turns at this time to considerations of the value of the determined 800,000 MCF of commercially recoverable gas.
*833 The defendant condemnor raises numerous qualifications and objections to an award for such gas.
First the condemnor argues at length that the claimant may only recover for gas "found in the piece of earth which is bounded laterally by the boundaries of the surface parcel and vertically by the lines drawn perpendicular to and from the corners of the surface parcel to the center of the earth.” In support of this proposition the condemnor cites no decisional law.
The complete answer to this "picket fence perimeter of production” contention is found in subdivision (5) of ECL 23-1303. That subdivision provides in relevant part: "The value of any property acquired pursuant to this section shall include the value of any commercially recoverable native oil and gas in place to the extent that holder of the property interest being acquired has a right thereto.”
The right to produce oil or gas has historically been analogized to the law of ferae naturae. Such concept was first developed in Westmoreland & Cambria Natural Gas Co. v De Witt (130 Pa 235, 18 A 724). Considered overly broad because of its holding that a property owner had no property interest in oil or gas until reduced to possession, the ferae naturae concept which continued, was explained and developed in the celebrated case of Ohio Oil Co. v Indiana (177 US 190). There Justice White pointed out that all of the public, under certain restrictions, have privileges and powers to reduce animals ferae naturae to possession, but that the landowner has exclusive privileges of reducing oil and gas to possession by operations conducted on his land, that the public has no property in animals ferae naturae until they are actually reduced to possession, but the landowner does have a property interest in oil and gas before he reduces them to possession, because he not only has the privilege to take them by operations on his land but rights that others not come on his land to take them. The view of rights to oil and gas set forth in Ohio Oil Co. (supra) is the view followed throughout the oil and gas-producing States. (See, 1 Sumners, Oil and Gas § 62.) It is traditionally the concept in the State of New York. (See, Wagner v Mallory, 169 NY 501 [referring to New York’s rule of capture, cited and followed by Matter of Envirogas, Inc. v Chu, 114 AD2d 38 (3d Dept 1986)].)
Such concept of ownership interest in oil and gas enumerated in Ohio Oil Co. v Indiana (supra) supplements the New *834 York condemnation statute, viz., subdivision (5) of ECL 23-1303 previously quoted. Read together it is crystalline clear that the claimants have a property interest in the gas produced from Ludden No. 1 well located on their property and the condemnor may not take it from the claimants without compensation.
The arguments of the condemnor to the contrary, founded on analogies to unitization statutes, are wholly misplaced and irrelevant. Those statutes regulating the number of oil and gas wells which may be drilled in a particular field were designed to "prevent waste” and provide for the "development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be had”. (See, ECL 23-0301 [which sets forth statements of policy].) Such statutes relating as they do to development of oil and gas production do not militate against and in fact have no application to those statutes which explicitly provide for the condemnation of oil and gas interests.
Note is specifically made at this point that the condemnor does not urge that the gas produced from Ludden No. 1 well is not "native gas”. The condemnor concedes that such gas has not migrated from another storage field or is gas which has been injected in the Beech Hill field of which Ludden No. 1 was a part. Consequently it is without dispute that the gas produced by claimants falls within the definition of "native oil or gas” as the same has been defined by the New York Department of Environmental Conservation, viz.: "'Native oil and gas shall mean the total volume of oil and gas indigenous to and still remaining in the storage reservoir at the time injection of extraneous gas is started.” (6 NYCRR 550.3 [z].)
In connection with fixing the value of the commercially recoverable gas the condemnor advances several additional restricting arguments.
CONSIDERATION OF GOVERNMENTALLY FIXED PRICE FOR NATURAL GAS
First the condemnor argues strenuously that this court is restricted in fixing the value of such gas to those prices fixed by the Federal Energy Regulatory Commission that were in effect at the time of condemnation. For the reasons which will be developed, this court rejects this argument completely.
The provisions for compensation in the event of condemnation are fixed in both provisions of the Federal and State *835 Constitutions. Each provides that private property may not be taken "without just compensation. ” (US Const 5th Amend; NY Const, art I, § 7 [a] [italics added].)
It has long been settled that the determination of "just compensation” in condemnation is for the courts. This matter was well stated in Monongahela Nav. Co. v United States (148 US 312, 327 [1893]) as follows: "The legislature may determine what private property is needed for public purposes — that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. ” (Italics added.)
The Supreme Court then expanded on its determination by quoting with approval the language of the Supreme Court of Mississippi as set down in Isom v Mississippi Cent. R. R. (36 Miss 300 [1858]) which held that any legislative interference with the power of the judiciary to determine just compensation was unconstitutional. (148 US, supra, at 327-328.)
In 1966 our Court of Appeals rejected the concept that a governmental controlled price of a commodity should affect the traditional concept of a "fair market value in a free economic setting.” (Matter of City of New York [Fifth Ave. Coach Lines], 18 NY2d 212, appeal dismissed 386 US 778 [1967].)
Most recently the United States Court of Appeals for the 11th Circuit held that a rental figure fixed by the Federal Communication Commission for the rental of utility poles by cable companies amounted to a taking of property without compensation and a contravention of the "just compensation” provision of the Fifth Amendment to the US Constitution. (Florida Power Corp. v Federal Communications Commn., 772 F2d 1537 [1985].) The court there quoted with approval the holding made in American-Hawaiian S. S. Co. v United States (124 F Supp 378, 382-383), to wit: " '[N]o power exists in any administrative agency of the Government to declare what compensation should be or to prescribe any finding rule in that regard.’ ” (772 F2d, supra, at 1546.) To the same effect see 4 Nichols, Eminent Domain § 12.01 (3) (rev 3d ed) and Matter of City of New York (Cross-Bronx Expressway) (195 Misc 842, 847, n 1).
On the basis of the authorities cited this court holds it to be the law that neither the Federal Energy Regulatory Commission nor any other governmental agency can surplant the judiciary and fix "just compensation” to a person whose *836 property has been condemned. In the instant case it is the right and duty of this court to fix just compensation for the commercially recoverable natural gas in place. In so doing this court is not hidebound by the price fixed by the Federal Energy Regulatory Commission.
CONSIDERATION OF EXTENT OF GOVERNMENTALLY FIXED PRICE TO JUST COMPENSATION
This is not to say however that the price fixed by that Commission is not relevant to this court’s consideration of "just compensation”. We look next then to the extent, if any, that a governmentally fixed price bears to a determination of just compensation.
In United States v Felin & Co. (334 US 624), the Supreme Court of the United States had presented the precise question of whether or not a governmentally fixed ceiling price constituted just compensation per se. Had the Supreme Court answered the question posed, one of the major issues confronting this court in the instant case would have been resolved. The Supreme Court did not answer the question. Members of the court disagreed with each other and made no determination of that issue. "We are not passing on the abstract question whether a lawfully established maximum price is the proper measure of just compensation’ whenever property is taken for public use.” (344 US, supra, at 630 [Frankfurter, J. (Vinson, Ch. J., and Burton, J., concurring)]; italics added.) The majority opinion was predicated on the proposition that the condemnee had failed to sustain the burden of proving that the award did not constitute just compensation.
Although the issue was left undecided in United States v Felin & Co. (supra), the case nonetheless contains the views of our highest court on the issue presented in the case at bar. Detailed examination of the views of the several Justices there expressed is essential to this court’s determination.
The opinion of Justice Frankfurter concurred in by the Chief Justice and Justice Burton was negative on the issue that the controlled price represented "just compensation”. (334 US, supra, at 641.)
Concurring in the judgment but not in the opinion and reasoning of Justice Frankfurter was a concurring opinion by Justice Reed concurred in by Justice Black and Justice Murphy. This concurring opinion by Justice Reed was quite positive on the issue. However, the same concurring opinion by *837 Justice Reed concurred in by Justice Black and Justice Murphy qualified the positiveness of the recited rule by stating: "If the Government fixed prices with the predominant purpose of acquiring property affected by its order, a different situation would be presented. Here we have price regulation of meat products on a national scale with judicial review of those regulations. The Government sought for itself no unique opportunity to purchase.” (334 US, supra, at 646.)
In a separate opinion concurring in the result reached by the majority of the court, Justice Ruthledge stated of the two recited diametrically opposed views: "I am in partial agreement with both groups”. (334 US, supra, at 647.)
In a separate dissenting opinion by Justice Jackson concurred in by Justice Douglas it was stated:
"It is hard to see how just compensation can be the legal equivalent of a controlled price, unless a controlled price is also always required to equal just compensation. * * *
"It must be remembered that market price, as such, is not controlling. The Fifth Amendment’s 'exact limitation on the power of the government’ is not market price — it is just compensation. The former is relevant and this Court has so considered it, only because, in a free market, it is perhaps the best key to value at the time of taking.” (334 US, supra, at 651-652.)
In reaching its decision in United States v Felin & Co. (334 US 624, supra), it is noteworthy that the majority of the court did not follow the decision in Vogelstein & Co. v United States (262 US 337), which had earlier definitively held that the prevailing price in a controlled market was just compensation. This failure together with the multiplicity and diversity of views expressed in United States v Felin & Co. (supra), leaves the waters thoroughly muddied and the underlying issue of whether a fixed governmental ceiling price is just compensation per se undecided. Since the matter is presented four square in the case at bar and since this court does not have the luxury of the Supreme Court in being able to sidestep the issue it is the unfortunate lot of this court to decide it.
The decision of this court is that a governmentally fixed ceiling price does not constitute just compensation per se. To hold otherwise would be an acknowledgment that such legislatively fixed price effectively removed from the judiciary the resolution of the issue of just compensation which as we have noted is constitutionally mandated as one for judicial determi *838 nation in a condemnation proceeding. Accordingly this court rejects the contention of the condemnor that the price fixed by the Federal Energy Regulatory Commission is the price which this court must fix for the condemnees’ commercially recoverable native gas in place.
While as already indicated governmentally regulated prices may properly be received in evidence on a determination of just compensation, there are a veritable host of considerations which may apply to the weight to be given to such regulated prices. For example, if the regulated price was fixed by the Government for the predominant purpose of permitting the Government to acquire the commodity, such prices should have little or no evidentiary value. On the other hand if the governmentally fixed prices were calculated to fix the price of a particular commodity generally and thus affect all trade between private sellers and buyers of that commodity throughout the Nation, greater weight should be accorded them. The concurring opinion of Justices Reed, Black and Murphy made note of the cited differentiation in purpose of enactment of price controls. (United States v Felin & Co., 334 US, supra, at 646.)
The underlying consideration of price controls is whether or not their effect is to create a market which is a purely artificial creation by the Government or whether such controls still leave a free open and competitive market which is essential to the establishment of market value and in turn determination of just compensation. (See, 4 Nichols, Eminent Domain § 12B.04 [rev 3d ed].)
The Natural Gas Policy Act which is found in 15 USC §§ 3301-3432 was enacted in 1978. It was under this Act that a Federal Energy Regulatory Commission (FERC) was established and which fixed rates for natural gas.
It is clear that the 1978 Natural Gas Policy Act did not attempt to fix prices nationwide on the sale of all natural gas from private producers and purchasers. Essentially it attempted to fix prices only in reference to purchases of natural gas by a public utility for resale to customers. It applied only to purchase and sales involving interstate commerce. Purchase and sale of an intrastate nature were excluded. There were many other exceptions.
It is the extent of application of price controls that is significant. This court does not agree with the condemnor that the decisions made in Matter of City of New York (Washington Sq. Southeast Slum Clearance Project — Benziger Bros.) (5 *839 AD2d 821), and Matter of City of New York (Lincoln Sq. Slum Clearance Project — Maxwell) (15 AD2d 153) definitively hold that governmental price controls are binding per se on a court in condemnation. There the Appellate Division, First Department, noted that "[t]he great majority of residential buildings was subject to rent control.” (Supra, at 161.) Because of that fact the court held that the controlled rents were the surest guide to a fair estimate of rental value in a condemnation proceeding. (See, 15 AD2d, supra, at 161.) These cases stand only for the weight to be given to controlled prices in fixing just compensation. They do not stand for the proposition that they represent just compensation per se. This court has considered the governmentally fixed price of natural gas under the Natural Gas Policy Act but because of its numerous expectations has given little weight to it.
Further this court finds it to be of prime importance to note that the expert of the condemnor on the application of gas price control testified that on July 17, 1980 a purchase of natural gas by a utility not for the purpose of sale but for the purpose of creating a storage pool would not be subject to any of the prices fixed by the FERC.
"By the Court:
"Q. So in the event, as the situation presents itself in this trial, if this gas was purchased by North Penn [or] by National Fuel, not for the purpose of sale but for the purpose of creating a storage pool, there is nothing in that act that indicates this application, is there?
"A. Not that I’m aware of.”
Since it is without dispute that the gas produced from Ludden No. 1 well in issue was shut in and utilized as a part of the storage field created by the condemnor it would appear that such gas was not subject to regulation in any event. Thus there is an additional and particular reason in the instant case for the inapplicability of the price fixed by the governmental agency.
In sum for all of the reasons noted this court holds that it is not limited in fixing just compensation for the condemnee’s natural gas to the price fixed by the Federal Energy Regulatory Commission.
CONSIDERATION OF EXISTING CONTRACT PRICE FOR SALE OF GAS
The court turns at this point to the condemnor’s second *840 argument which is that the court is restricted by the price for natural gas which was contained in the North Penn Gas Company contract for purchase of the condemnee’s natural gas at the time of condemnation by the plaintiff, National Fuel Gas Supply Company, Inc. That contract initially created in March 1949, as a part of a compromise and settlement of several controversies between the condemnee and North Penn Gas Company provided for the purchase by the latter of the condemnee’s natural gas at 25 cents per MCF. Through several renegotiations over the years between the parties the contract price at the time of condemnation in 1980 was 66.5 cents per MCF.
Because of certain provisions in the contract of sale of gas between the condemnee, Cunningham, as seller and the North Penn Gas Company as purchaser it is essential to determine a point in time at which the natural gas in place must be valued. In the instant case where the taking is by an administrative order with the compensation to be subsequently determined by judicial proceedings it is uniformly held that damages are to be assessed as of the date of the taking. "Any changes in the condition of the property which thereafter take place, whether they result in an increase or a decrease in the value thereof, cannot affect the amount of compensation to be paid.” (3 Nichols, Eminent Domain § 8.5 [1] [rev 3d ed], and host of NY cases there cited; see also, 4 Nichols, Eminent Domain ch 12A [rev 3d ed].)
In the instant case it has been stipulated that the date of taking is July 17, 1980. It is as of that date that value must be fixed.
Next it is essential to recall to mind that the interest of Cunningham, the condemnee, is not that of a fee owner, but rather that of a lessee. It is the leasehold interest which authorizes the condemnee to drill, remove and save oil and gas, reserving to the condemnee seven eighths of such oil or gas. That is what is being condemned. The remaining one eighth of oil or gas produced and saved belongs by way of royalty payment to the lessor who in the particular instance at hand is also the condemnor, National Fuel Gas Supply Company, Inc.
For over 40 years Cunningham, the condemnee, has sold the gas which he produced from the acreage in issue to the North Penn Gas Company. The condemnor argues, and this court is of the opinion that it does so with great merit, that the price *841 received from such sale should determine the fair market value and in turn the just compensation due the condemnee.
In Motsiff v State of New York (32 AD2d 729 [1969]) the Fourth Department of the Appellate Division stated: "While actual rentals are not an absolute criterion, nevertheless, where, as here, there is no claim that the leases were improvident or that their terms were unusual, they should be considered in determining rental value.”
In 4 Nichols, Eminent Domain § 12B.10 (rev 3d ed) it is stated: "However, as a safe working rule, if property is rented for the use to which it is best adapted, the actual rent reserved, capitalized at the rate which local custom adopts for the purpose, forms one of the best tests of value, and accordingly evidence of the rent actually received at a time reasonably near the time of the taking, should be admitted”. (Italics added.)
The condemnees argue that the contract price of 66 Vi cents per MCF was substantially below the price being paid for natural gas which was not subject to Federal price control. This contract, the condemnees urge, was not entered into for the purpose of making the condemnor a third-party beneficiary of an improvident price. Conceding for the purpose of argument the contentions of the condemnee, what is overlooked in the argument is the fact that the contract price is the price binding on any purchaser of the condemnees’ leasehold estate. No matter who acquired the condemnees’ interest in the natural gas, that party would be bound by the 66 Vzcent-per-MCF contract sale price for the natural gas.
Further the contract between the condemnees and the purchaser of the gas not only fixed the price but also the purchaser. It was specifically agreed that the condemnees would sell the gas produced to the North Penn Gas Company. Thus any attempt by a purchaser of the condemnees’ leasehold interest who had the thought in mind to terminate sale to the North Penn Company and sell the gas produced to an intrastate purchaser thus avoiding the restrictions of both price fixing by governmental regulations and the price fixed by contract would be met with a suit for breach of contract by the contract purchaser for sale to one other than the contract purchaser.
The argument of the condemnees is further weakened by the admission of the condemnees that there was no available purchaser of the natural gas other than the North Penn Company.
*842 "Q. When you went in to North Penn to ask them for these raises, did you have any hammer against them?
"Ans: No. They had the hammer because we had no other pipeline in the vicinity to sell it to. ” (Italics added.)
CONSIDERATION OF FORCE MAJEURE CLAUSE IN CONTRACT OF SALE
Finally to avoid the contract price of 66 Vz cents per MCF the condemnees argue that the agreement for sale of gas by the condemnees to the North Penn Gas Company contained a "force majeure” clause. Such clause provides as follows:

"FORCE MAJEURE

"Neither party to this agreement shall be liable for failure to comply with the terms of this agreement if such failure is due to strikes, accidents, line breakage, floods, depletion of gas reserves, legal proceedings, acts of God or other causes beyond its reasonable control.”
The argument advanced by the condemnees is that the condemnation of the leasehold was a "legal proceeding” thus making the force majeure clause effective. Because it was effective it is argued, the condemnees were no longer liable under contract to sell the produced gas at the contract price of 66 Vz cents per MCF. Thus such gas should be valued by a standard other than contract price. So runs the argument.
This court concedes great difficulty with this argument. The condemnees cite no decisional law in favor of the argument. Contrariwise, the condemnor here has cited no decisional law against the argument. Extensive legal research by this court extending over the course of several months has disclosed nothing on the issue under case law or text authority. It appears to be truly a novel question.
The latest discovered case dealing with a "force majeure” clause is Kel Kim Corp. v Central Mkts. (70 NY2d 900 [1987], affg opn by that distinguished jurist, Yesawich, Jr., J., 131 AD2d 947 [3d Dept]). That case turned on whether or not the items specified to give rise to the effectiveness of the force majeure clause had been met by the plaintiff. Holding that "words constituting general language of excuse are not given the most expansive meaning possible, but are held to apply 'only to * * * the same general kind or class as those specifically mentioned”, the court determined that the plaintiff did *843 not demonstrate the application of any of the enumerated reasons for excusing performance. (Supra, at 950.)
This court finds that the decision of Kel Kim (supra) is informative on the operation and construction of a "force majeure” clause but not decisive on the issue presented in the case at bar. This is for the reason that it is perfectly clear to this court that a condemnation proceeding falls clearly within the orbit of "legal proceedings”, one of the items which triggers the "force majeure” clause in the instant action.
Despite this court’s conclusion that the force majeure clause was triggered by the institution of the condemnation proceeding, it is nonetheless the opinion of this court that the contract price is still a limiting force on fixing valuation of the natural gas in issue.
It is uniformally agreed that any changes in the condition of property which takes place after condemnation, whether they result in an increase or decrease in the value thereof, cannot affect the amount of compensation to be paid. (See, 3 Nichols, Eminent Domain § 8.5 [1] [rev 3d ed]; 4 Nichols, op. cit., § 12A.02, and cases cited.) Chester Litho v Palisades Interstate Park Commn. (27 NY2d 323, 325) stated, "It is at the time of the taking when the amount of damages 'is to be measured and fixed’ (Wolfe v. State of New York, 22 N Y 2d 292, 295; see also, Kahlen v. State of New York 223 N. Y. 383, supra; Jackson v. State of New York, 213 N. Y. 34, supra) and subsequent fluctuations in value, either increases or decreases, should not be considered (Matter of Munson, 29 Hun 325, 335).”
While particular and differing procedures attending condemnation proceedings in various States and jurisdictions may give rise to a question of precisely when a condemnation actually occurred (see, 4 Nichols, Eminent Domain § 12A.02 [rev 3d ed]), there is no such problem in the instant case. It was stipulated that the condemnation in issue occurred on July 17, 1980 when the condemnor took possession of the well in issue.
Our New York appellate courts have held that "[t]he constitutional requirement of just compensation requires that the property owner be indemnified so that he may be put in the same relative position, insofar as this is possible, as if the taking had not occurred”. (City of Buffalo v Clement Co., 28 NY2d 241, 258, and cases cited; italics added.) To the same effect is Matter of Port Auth. Trans-Hudson Corp. (Hudson & Manhattan Corp.) (27 AD2d 32, 40 [1st Dept 1966]).
*844 Viewing the subject gas well under the stated rule, it is clear that until the precise moment of taking possession occurred on July 17, 1980, not only the condemnees but any purchaser of the condemnees’ interest in natural gas would have been bound by the contract terms requiring sale at 66 Vz cents per MCE and to the North Penn Gas Company. The provisions of the force majeure clause releasing the condemnees and successors in interest from these did not become operative until after the condemnation. Nothing is more important than this inescapable fact. Where the argument of the condemnees fails is that it seeks to take advantage of increased prices which were only available after condemnation and as a consequence of the condemnation. Such increases in value would under any circumstances have occurred after the condemnation and under the uniformly decided precedent which has been noted cannot be properly considered by this court. It is so held.
There is a further consideration which prevents this court from considering concededly higher sales price for natural gas than the price contained in the outstanding contract. It is the failure of the condemnees to show market for the gas which would or could result in such higher prices. There is no evidence of possible sales to any purchaser other than to the North Penn Gas Company. It was conceded that it was the only pipeline purchaser in the vicinity. Condemnees did not prove or attempt to prove any available intrastate market for the gas. This court finds only a theoretical demand for the gas at prices other than those fixed in the outstanding contract. It was held in Mills v United States (363 F2d 78 [8th Cir 1966]) that the failure to show a market for condemned coal deposit would entitle the condemnee to only a nominal value for them. In United States v Land in Dry Bed (143 F Supp 314 [SD Cal 1956]) it was stated that the testimony must establish a present or future demand as a connecting link between adaptability and value. Otherwise, the quantity and the price * * * may not be presented to the jury as a factor used as a basis for the expert’s opinion testimony.
For all of the reasons noted this court finds the contract price of 66Vz cents per MCF to be the best test of value and accordingly adopts it and holds it to be the fair market value of the commercially recoverable native gas in place.
The court upon review also finds that the evidence best *845 supports an annual cost of production of the commercially recoverable gas to be $13,175 and accordingly adopts it and holds it to be the determined annual cost of production.
On the findings of fact which have been made and on the law which has been determined to be applicable, there follows this court’s computation of the amount to be awarded the condemnees for the commercially recoverable native gas in place together with authorized statutory interest thereon computed from the date of condemnation (July 17, 1980) to the date of the decision herein (Sept. 6, 1989).
AMENDED COMPUTATION
Determined amount of commercially recoverable native gas in place $800,000 MCF
Gas to be paid to royalty holder (Vfcth royalty) (subtract) -$100,000 MCF
Gas in place for operator $700,000
Determined value of commercially recoverable native gas in place as of date of condemnation (1980) per MCF (multiply) X $.665
Gross value of commercially recoverable native gas in place $465,500
Number of years of commercial production of native gas in place (divide) h- 20
Value of annual gross production of commercially recoverable native gas in place $23,275
Determined cost of annual gross production (subtract) -$13,175
Net value each year of commercially recoverable native gas in place $10,100
Present value of $1 per year for 20 years with compound discount of 10% (1 NY PJI2d 516 [1989 Supp]) (multiply) X 8.51
Present value of $465,500 commercially recoverable native gas in place less cost of production $85,951*
*846 Statutory interest per CPLR 5004 of 6% X $85,951 (for period July 17, 1980 to June 25, 1981 — 343 days @ $14.13/day) $4,846.59-
Statutory interest per CPLR 5004 of 9% X $85,951 (for period June 25, 1981 to Sept. 6, 1989 — 8 years, 73 days © $21.19/day) $63,431.59
Total of present value of commercially recoverable native gas in place $85,951.00
together with lawful interest— July 19,1980 to June 25,1981 $ 4,846.59
together with lawful interest— June 25, 1981 to Sept. 6,1989 $63,431.59
$154,229.18
With the exception of the valuation of the commercially recoverable native, natural gas in place, all other interests compensable under the law in this condemnation proceeding, specifically including the right to inject gas into the Oriskany Sand formation, to store gas therein and remove gas therefrom, together with interests in and to equipment located upon the surface and the pipe in existing wells together with lawful interest upon said interests have all heretofore been resolved by compromise and settlement between the condemnor and the condemnees and the parties have stipulated that any claims for such interests are specifically withdrawn from this proceeding for condemnation and that judgment herein is to be entered only for this court’s determination of the commercially recoverable native gas in place.

 Valuation includes any risk factor of both future production and future cost of production.